**CITYWIDE BANK OF DENVER,**
Plaintiff,

v.

**Alexis M. HERMAN, Secretary, United States Department of Labor; United States Department of Labor; United States Department of Labor, Pension and Welfare Benefits Administration, Defendants.**

No. CIV.A. 94–B–2965.

United States District Court,
D. Colorado.

Sept. 29, 1997.

I. Thomas Beiging, Hugo Teufel, III, Gerard J. Wyrsch, McKenna & Cuneo, Denver, CO, for Plaintiff.

Alexander Fernandez, U.S. Dept. of Labor, Washington, DC, Ann M. Noble, Assoc. Regional Solicitor, U.S. Dept. of Labor, Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

In this case arising under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.* (ERISA), defendants, Alexis M. Herman, Secretary, United States Department of Labor (Secretary); United States Department of Labor (DOL); and United States Department of Labor, Pension and Welfare Benefits Administration (PWBA) (collectively, defendants) and plaintiff, Citywide Bank of Denver (Citywide) filed motions for summary judgment pursuant to Fed.R.Civ.P. 56 on plaintiff's claims for declaratory and injunctive relief. After consideration of the motions, briefs and oral arguments, I will grant Citywide's motion for summary judgment on claim one and deny defendants' motion. I will deny as moot, plaintiff's motion for summary judgment on claim two.

### I.

The following facts are undisputed. In 1976, plaintiff Citywide, a commercial bank in Denver, Colorado, established the Citywide Bank of Denver Profit–Sharing Plan (Plan) pursuant to ERISA. Fiduciaries of the Plan included Charles Sillstrop (Sillstrop), since deceased, Jean Warren, and the Bank. On November 20, 1992, Sillstrop invested $137,169.32 of the Plan's money in Certificate of Deposit No. 3195 (CD 1) issued by Citywide. In December, 1992, Richard Kennedy was appointed co-trustee to take over from Sillstrop who resigned as a result of illness. On January 1, 1993, the Trustee invested $247,174.62 of the Plan's funds in Certificate of Deposit No. 3206 (CD 2) issued by Citywide.

It is undisputed that effective December 19, 1992, changes in the Federal Deposit Insurance Corporation (FDIC) regulations allowed only $100,000 per plan of FDIC insurance on employee benefit plans' investments in undercapitalized FDIC insured banks. The parties contest whether, as a matter of law, Citywide was undercapitalized on January 1, 1993, the date of the purchase of CD 2.

In a letter dated February 5, 1993, defendant PWBA notified Citywide, through its counsel, that "after December 19, 1992, the Plan's holding of deposits in Citywide Bank of Denver in excess of the $100,000 insured by the FDIC would be a violation of ERISA." Pltf's. MSJ Ex. F p. 6. In this letter, PWBA suggested, *inter alia,* that "[i]f the Plan holds greater than $100,000 in deposits with Citywide Bank of Denver, that amount should be reduced to no higher than $100,000, so as to be covered by FDIC insurance." *Id.* The February 5, 1993 letter also stated:

> [I]f the Plan fiduciaries take the corrective action suggested above and in my previous letter, the Department will take no further action with regard to these issues either by bringing a law suit or ... by furnishing information concerning the substance of our investigation to third parties. However, ERISA section 502(*l*) requires the Secretary of Labor to assess a civil penalty against a fiduciary who breaches a fiduciary responsibility under ... part 4 of Title I of ERISA. The penalty under section 502(*l*) is equal to 20 percent of the "applicable recovery amount", a term which means any amount recovered from a fiduciary or other person with respect to a breach or violation either pursuant to a

settlement agreement with the Secretary or ordered by a court to be paid in a judicial proceeding instituted by the Secretary. Further you should understand that the Department is speaking only for itself and only with regard to the issues discussed above; the Department has no authority to restrain any third party or any other governmental agency from taking any action it may deem appropriate.

Ex. F, p. 8. The letter also stated:

We hope this letter will be helpful to the Plan fiduciaries in the execution of their fiduciary duties, and that, in respect to the specific matters discussed, they will promptly take appropriate corrective action. Please advise me, in writing, ... what action the Plan fiduciaries intend to take to correct the violations described above and in my previous letter.

*Id.* p. 9.

On February 11, 1993, the same day it received the PWBA's letter, Citywide redeemed the CD in question (No. 3195), purchased a Citywide Bank CD (No. 3217) for $100,000 and transferred the balance of the funds to Colorado State Bank, custodian of the Plan assets. Pltf. S.J.Brief p. 4; Def. Cross-motion for S.J. Ex.D, p. 1; Ex. F, p. 1. The balance of the cash from the sale of the CDs was used to purchase "SEI Government Portfolio shares." Def. Cross-motion for S.J. Ex. F, p. 1.

In a letter dated October 14, 1993 to Citywide, the PWBA assessed a civil penalty pursuant to § 502(*l*) stating in part:

[T]his office has concluded its investigation of the Plan and the activities of Citywide Bank of Denver as a Plan fiduciary. Based on the facts gathered during that investigation we concluded that, as fiduciaries, Citywide Bank of Denver, Charles Sillstrop, and Jean Warren violated their fiduciary obligations to the Plan and violated several provisions of ERISA. The specific actions taken which violate ERISA were detailed in my previous letters.

\*　　\*　　\*　　\*　　\*　　\*

Since you have taken the agreed-upon corrective action with respect to the specific violations detailed in the letters of October

30, 1992, February 5, 1993, and March 31, 1993, the Department will take no further action with respect to these matters, except the imposition of the civil penalty as required by ERISA section 502(*l*).

Def. Cross-motion for S.J. Ex. F, pp. 1–2.

Initially, defendants assessed a civil penalty against Citywide in the amount of $57,-341.37. Based on further information supplied by Citywide to defendants about the purchase date of CD No. 1, the penalty was recomputed and lowered to $49,907.51. The revised penalty amount is not in dispute.

In a letter dated November 17, 1993, counsel for Citywide requested a conference with the PWBA to discuss the assessed penalty contending, *inter alia,* that because there was no monetary loss from the CD "exchange", 1) there were no funds recovered from a fiduciary against which a penalty could be assessed, 2) there was no settlement agreement or court order, and that 3) the Plan's investment in excess of $100,000 in Citywide CDs did not violate ERISA.

Citywide then sent a letter to PWBA on its letterhead dated December 27, 1993 and signed by W.D. Edwards, Citywide Executive Vice President, stating, in pertinent part:

This letter will serve as our petition to waive or reduce the penalty which has been assessed by the Secretary under the provisions of ERISA Regulation 2570.85. This petition is not to be construed as a waiver of any other rights available to Citywide Bank of Denver.

Based upon prior conversations with Mr. Sillstrop and Mrs. Warren prior to Mr. Sillstrop's death, they were aware that the bank could not accept brokered deposits, but were of the opinion that the profit sharing plan deposit was not considered a brokered deposit. They did not realize that the pass-through coverage afforded to profit sharing plans was not available in our bank after December 19, 1992, due to the Cease and Desist Order. This good faith misunderstanding of the law is understandable in light of the complexity of the law and its recent application to the then existing circumstance that Citywide Bank found itself in.

**970**

Def. Cross-motion for S.J. Ex. J, p. 1 (12/27/93 letter).

This letter was supplemented by Citywide counsel's January 6, 1994 letter in which was enclosed a copy of CD No. 1 showing a purchase date of November 20, 1992, before the effective date of the relevant FDIC regulations. Def. Cross-motion for S.J. Ex. L, p. 2.

On September 27, 1994, the PWBA notified Citywide that it had made a final determination not to grant its petition to waive or reduce the assessed penalty. Def. Cross-motion for S.J. Ex. K, p. 1. However, in a letter dated November 3, 1994, the PWBA informed Citywide that it had reduced the civil penalty assessed from $57,341.37 to $49,-907.51 based on the following:

> On February 12, 1993 Citywide paid the Plan $138,420.74 to redeem Citywide Certificate of Deposit (CD) No. 3195, $100,000 of which was reinvested in Citywide CDs. A 20% penalty of $7,684.14 was assessed under ERISA Section 502(*l*) on the $38,-420.74 difference between the $138,420.74 payment from Citywide to the Plan to redeem CD No. 3195 and the $100,000 reinvested in CD No. 3217.
>
> A January 6, 1993 letter to this office from Bruce Muir included a copy of CD No. 3195 which was purchased on November 20, 1992. Since $137,169.32 was invested on CD No. 3195 on November 20, 1992, prior to the changes in the FDIC regulations which took effect on December 19, 1992, the penalty on CD No. 3195 will be reduced to $250.28 or 20% of the $1,251.42 of interest rolled into CD No. 3195 after December 19, 1992. This reduces the total penalty assessed against Citywide from $57,341.37 to $49,907.51

Def. Cross-motion for S.J. Ex. N, p. 2; *see also id.* at p. 4. This action followed on December 30, 1994.

## II.

### *SUMMARY JUDGMENT STANDARD*

The very purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995). Fed.R.Civ.P. 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.,* 622 F.2d 516, 519 (10th Cir.1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 252, 106 S.Ct. at 2511–12; *Mares,* 971 F.2d at 494.

## III.

Based on the DOL's conclusion that it entered into a settlement agreement with Citywide and that Citywide breached its fiduciary duty to the Plan, the DOL penalized Citywide pursuant to § 502(*l*) of ERISA, which provides in pertinent part:

> Civil penalties on violations by fiduciaries
>
> (1) In the case of—
>
> > (A) any breach of fiduciary responsibility ... by a fiduciary, or
> >
> > (B) any knowing participation in such breach or violation by any other person,

the Secretary shall assess a civil penalty against such fiduciary or other person in an amount equal to 20 percent of the applicable recovery amount.

(2) For purposes of paragraph (1), the term "applicable recovery amount" means any amount which is recovered from a fiduciary or other person with respect to a breach or violation described in paragraph (1)—

> (A) pursuant to any settlement agreement with the Secretary, or

> (B) ordered by a court to be paid by such fiduciary or other person to a plan or its participants and beneficiaries in a judicial proceeding instituted by the Secretary under subsection (a)(2) or (a)(5) of this section.

(3) The Secretary may, in the Secretary's sole discretion, waive or reduce the penalty under paragraph (1) if the Secretary determines in writing that—

> (A) the fiduciary or other person acted reasonably and in good faith, or

> (B) it is reasonable to expect that the fiduciary or other person will not be able to restore all losses to the plan (or to provide the relief ordered pursuant to subsection (a)(9) of this section) without severe financial hardship unless such waiver or reduction is granted.

29 U.S.C. § 1132(*l*)(3)(A) and (B).

Citywide moves for summary judgment on its claims for declaratory and injunctive relief. Citywide argues that:

1. defendants acted in excess of their statutory authority to impose civil penalties pursuant to § 502(*l*) of ERISA, 29 U.S.C. § 1132(*1*) because:

> a. there was no breach of fiduciary duty;

> b. no plan funds were recovered upon which to assess a penalty; and

> c. there existed no settlement agreement between the parties or a court order in a proceeding instituted by defendants in which the court ordered payment;

and

2. defendants imposed civil penalties against Citywide without fully or fairly

evaluating all relevant factors including Citywide's voluntary mitigation efforts, thus constituting an abuse of discretion.

*See* Complaint ¶¶ 53–62. Citywide seeks an injunction restraining defendants from taking any further action to enforce the civil penalties, costs, and attorney fees pursuant to 29 U.S.C. § 1132((g)(1).

Defendants filed a cross-motion for summary judgment on plaintiff's claims contending that "[a]s a matter of law, there has been a settlement and a recovery by the Plan on which the Secretary is required to assess the § 502(*l*) penalty." Def. Brief in support of Cross-motion for Summary Judgment, p 4. Defendants also argue that whether there was a valid settlement agreement or not, Citywide, in fact, breached its fiduciary duty to the Plan in direct violation of ERISA §§ 403(c)(1) and 405(a)(1)(A), (B), and (C).

### A. DEFENDANTS ACTED IN EXCESS OF THEIR STATUTORY AUTHORITY TO IMPOSE CIVIL PENALTIES PURSUANT TO § 502(l) OF ERISA, 29 U.S.C. § 1132(l)(1)

#### 1. Breach of fiduciary duty

The crux of defendants' argument is that the Citywide trustees breached their fiduciary duties based on changes in FDIC regulations effective December 19, 1992, which resulted in the Plan's Citywide CDs being insured by the FDIC for no more than $100,000. Thus, according to defendants, any amount over $100,000 was at risk in violation of ERISA provisions and constituted a breach of Citywide's fiduciary duties to the Plan.

■ At the outset, the parties dispute whether I must determine, as a threshold issue, whether a breach of fiduciary duty occurred even if there exists a settlement agreement between the parties. I conclude I must determine this question as a threshold issue.

In *Rodrigues v. Reich*, 1996 WL 37794 (N.D.Cal.1996), the sole district court case addressing this issue, the court held, *inter alia*, that § 502(*l*) requires the Secretary to prove a predicate breach of fiduciary duty.

*Id.* at *3. Rodrigues appealed, partly on the issue of predicate proof of fiduciary duty breach. In *Rodrigues v. Herman*, 121 F.3d 1352 (9th Cir.1997), the Ninth Circuit considered, as a matter of first impression in the Circuit Courts of Appeal, the necessity of proving breach of fiduciary duty. The Court stated:

> [w]hile we agree ... that Congress' intent in enacting § 502(*l*) was to strengthen enforcement and deter violations of fiduciary duties, we do not believe the statute contemplates punishment where no violation has occurred. The language of the statute permits imposition of the penalty only "in the case of any breach of fiduciary responsibility." 29 U.S.C. § 1132(*l*)(1). The Secretary argues that the words "in the case of any breach" are merely an instruction "to the Secretary regarding when to assess the penalty; they are not an element of the penalty assessment itself." Under this reading, however, the Secretary alone would determine when the fiduciary breach occurred that triggers the statute. If this were the case, the Secretary would have unchecked authority to impose a penalty, so long as some recovery had been gained through a settlement agreement.

*Id.* at *2. The court affirmed the district court's ruling granting summary judgment stating "the district court correctly interpreted § 502(*l*) to require the Secretary to establish as a preliminary matter that a breach ... had occurred." *Id.* *3.

I am persuaded by this well reasoned opinion. Therefore, I adopt its holding that as a threshold matter, I must decide whether a breach of fiduciary duty has occurred.

■ Citywide argues that there was no breach of fiduciary duty by the Plan trustees' investment in Citywide CD's over $100,000 because at all times pertinent, Citywide was eligible for insurance in amounts over $100,-000. Thus, according to Citywide, because the CDs were fully insured and not at risk, there was no breach of their fiduciary duty.

### a. *ERISA fiduciary obligations*

ERISA § 403(c)(1) provides in pertinent part:

> [T]he assets of the plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants and beneficiaries.

29 U.S.C. § 1103(c)(1).

Further, § 404(a)(1) states that:

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries;
>
> (B) with the skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; . . .

29 U.S.C. § 1104(a)(1).

### b. *FDIA Act*

Originally enacted in 1950, 12 U.S.C. § 1811 created a "Federal Deposit Insurance Corporation ... which shall insure ... the deposits of all banks ... which are entitled to the benefits of insurance under this chapter...." On December 19, 1991, the Federal Deposit Insurance Corporation Improvement Act (FDICIA), P.L. 102–242 (section 543), was enacted which, *inter alia,* amended certain provisions of the FDIA Act governing the extent of insurance coverage provided by the FDIC for deposits in FDIC-insured institutions. FDICIA, section 311. On December 19, 1992, one year after their promulgation, the amendments became effective.

#### i. *Pass-through insurance*

"Pass-through" insurance provides aggregate insurance of $100,000 per depositor. For example, if a group of three depositors purchase a CD, it is insured up to $300,000, rather than $100,000. Here, then, if City-

wide met the requirements for pass-through insurance, the $247,174.62 CD purchased by Citywide on January 1, 1993, would have been insured for up to $100,000 *for each plan participant in the aggregate*—clearly enough to fully protect the CD in question. If Citywide did not meet the pass-through insurance requirements, the CD was insured only for $100,000, leaving $147,174.62 uninsured and, thus, at risk. The parties dispute whether, as a matter of law, Citywide was eligible for "pass-through" insurance.

The inquiry narrows to whether Citywide was able to accept brokered deposits on January 1, 1993, the date it purchased Citywide CD No. 2 for $247,174.62. The applicable law consists of the statutes and regulations in effect on January 1, 1993, the date CD No. 2 was purchased by the trustee.

The New Rules state, *inter alia,* when "pass-through" insurance is or is not provided for deposits:

(a) "Pass through" insurance. Except as provided in paragraph [b] of this section, any deposits of an employee benefit plan or of any eligible deferred compensation plan ... in an insured depository institution shall be insured on a "pass through" basis, in the amount of up to $100,000 for the non-contingent interest of each plan participant. . . .

(b) Exception. (1) "Pass-through" insurance shall not be provided pursuant to paragraph (a) of this section with respect to any deposits accepted by an insured depository institution which, at the time the deposits are accepted, may not accept brokered deposits pursuant to section 29 of the Act unless, at the time the deposit is accepted:

(i) The institution meets each applicable capital standard; and

(ii) The depositor receives a written statement from the institution indicating that such deposits are eligible for insurance coverage on a "pass-through" basis.

12 C.F.R. § 330.12 (emphasis added).

Here, the "applicable capital standard" which Citywide was required to meet on January 1, 1993 to be eligible for "pass-through" insurance is set out in 12 CFR

§ 337.6 (in effect from June 5, 1992 to October 25, 1993):

Brokered deposits.

(a) Definitions. For the purposes of this § 337.6 the following definitions apply:

. . . . .

(10) Well capitalized insured depository institution. (i) The term well capitalized insured depository institution means an insured depository institution that:

. . . . .

(D) Has not been notified by its appropriate Federal banking agency that it is in a *"troubled condition"* as that term is defined by the appropriate Federal banking agency in its regulations implementing section 32 of the Federal Deposit Insurance Act.

. . . . .

iii. As to insured nonmember banks, the term *troubled condition* is defined in 12 CFR 303.14(a)(4) to mean an institution that:

. . . . .

(C) Is subject to ... *a cease and desist order* or proceeding initiated by either the FDIC or the appropriate state banking authority. . . .

12 CFR § 337.6 (emphasis added).

"A well capitalized insured depository institution may solicit and accept, renew or roll over any brokered deposit without restriction by this section." *Id.* "An adequately capitalized insured depository institution may not accept, renew or roll over any brokered deposit unless it has applied for and been granted a waiver of this prohibition by the FDIC in accordance with the provisions of this section." *Id.* at (2)(i). "An undercapitalized insured depository institution may not accept, renew or roll over any brokered deposit." § 337.6(b)(3)(i).

Citywide's sole argument is that it was well capitalized during the time pertinent to the CD transactions in question and, thus, was eligible for "pass-through" insurance. However, Citywide does not dispute that between September 26, 1991 and March 21, 1995, it was an insured nonmember bank

subject to a Cease and Desist Order issued pursuant to the Federal Deposit Insurance Act (FDIA), 12 U.S.C. § 1818(b). The Order provided in pertinent part:

IT IS ORDERED, that the Bank ... cease and desist from the following unsafe or unsound banking practices and violations of laws and/or regulations:

(a) Operating the Bank with management whose policies and practices are detrimental to the Bank and jeopardize the safety of its deposits;

\* \* \* \* \* \*

(c) Operating with an inadequate level of capital protection.

Def. Reply to Pltf. Resp. to Def. S.J.Cross-Mtn. Ex. B p.C–1503–04. Therefore, pursuant to 12 CFR § 337.6, on January 1, 1993, Citywide was in a "troubled condition" and, thus, was not "well capitalized." As such, Citywide was not eligible for "pass through" insurance and Citywide Plan deposits were insured in the aggregate only up to $100,000.

Citywide attempts to avoid this effect of the plain language of 12 CFR § 337.6 on the dates it purchased the CD's in question by arguing that the FDIC itself notified Citywide it was "well capitalized." Citywide proffers a "Risk–Related Deposit Insurance Assessment Rate Notification" dated December 1, 1992 and sent to it by the FDIC in which the FDIC states:

Pursuant to Section 7 of the Federal Deposit Insurance Act (12 U.S.C. § 1817), as amended by Section 302 of the Federal Deposit Insurance Corporation Improvement Act of 1991, your institution is assigned the following risk classification [well capitalized] *for purposes of determining the annual deposit insurance assessment rate for the six month period beginning January 1, 1993.*

Pltf. Brief in Response to Def. S.J.Cross-Motion Ex.E p. 1. (emphasis added).

Explicitly, however, the assessment notice was given only for the limited purpose of determining Citywide's "insurance premium" from January 1, 1993 to July 1, 1993. This notice does not obviate the effect of the Cease and Desist Order then in effect. Consequently, as a matter of law, Citywide was not "well capitalized" and, thus, could not accept "brokered deposits" on the transaction dates in question here. Hence, Citywide was not eligible for "pass-through" insurance which would have provided for the greater amount of FDIC insurance on Citywide CD No. 2.

The trustee's failure to protect Plan deposits through fully insured investments was in direct violation of ERISA §§ 403(c)(1) and 404(a)(1)(A), (B), and (C). Accordingly, as a matter of law, Citywide breached its fiduciary duties to the Plan.

### 2. *Applicable Recovery Amount*

■ Citywide next argues that the civil penalty assessed against it by the DOL is improper because there was no recovery of funds against which the 20 percent statutory rate could be assessed. Citywide reasons that because there was no loss to the Plan or its beneficiaries, there was no "applicable recovery amount." 29 U.S.C. § 1132. It argues that if a breach did occur, no amount was recovered from it or any other person in connection with the breach. During the relevant times, the CDs in question bore competitive interest rates and earned $2,262.90 in interest which inured solely to the benefit of the Plan and its beneficiaries. Thus, according to plaintiff, no loss was incurred so as to meet the statutory definition of "applicable recovery amount." Pltf.S.J.Motion p. 12. Citywide's view of § 502(*l*)(2) is overly narrow.

It is undisputed that on February 11, 1993, Citywide redeemed Citywide CDs Nos. 1 and 2 and returned to the Plan $248,286.11 for placement in a safer investment. Here, the loss which occurred is measured by the amount of money *at risk* because of Citywide's actions as a Plan trustee. If Citywide had become insolvent when the CD was insured for only $100,000, $148,286.13 of the plan participants' money would have been forfeited because Citywide was ineligible for pass through insurance.

### 3. *Settlement agreement or court order*

■ Section 502(*l*) also requires that the applicable recovery amount be recovered

pursuant to a "settlement agreement with the Secretary, or ordered by a court to be paid ... in a judicial proceeding instituted by the Secretary ..." *Id.* Here, it is undisputed that there was no judicial proceeding instituted by the Secretary. Thus, the only statutory basis for imposing the civil penalty would be a settlement agreement between Citywide and the Secretary.

The parties agree there was no formal, signed settlement. Rather, the parties argue their respective positions based on the following exchange of letters.

In a letter dated February 5, 1993, defendant PWBA answered a January 14, 1993 letter, not part of the record before me, from Citywide's counsel. In the letter, the PWBA notified Citywide, through its counsel that:

[i]t is our view ... that after December 19, 1992, the Plan's holding of deposits in Citywide Bank of Denver in excess of the $100,000 insured by the FDIC would be a violation of ERISA. In connection with the Plan's holding of deposits with [Citywide] we suggest that the following action be taken:

.    .    .    :    .    .

(4) If the Plan holds greater than $100,000 in deposits with Citywide Bank of Denver, that amount should be reduced to no higher than $100,000, so as to be covered by FDIC insurance....

We have provided the foregoing statement of our views to help Mr. Sillstrop, Ms. Warren, [Citywide], and Mr. Kennedy to evaluate their obligations as fiduciaries within the meaning of ERISA. Should they fail to take the corrective action we have suggested, this matter may be referred to the Office of the Solicitor of Labor for possible legal action....

[I]f the Plan fiduciaries take the corrective action suggested above and in my previous letter, the Department will take no further action with regard to these issues either by bringing a law suit or ... by furnishing information concerning the substance of our investigation to third parties. However, ERISA section 502(*l*) requires the Secretary of Labor to assess a civil penalty against a fiduciary who breaches a fiducia-

ry responsibility under ... part 4 of Title I of ERISA. The penalty under section 502(*l*) is equal to 20 percent of the "applicable recovery amount", a term which means any amount recovered from a fiduciary or other person with respect to a breach or violation either pursuant to a settlement agreement with the Secretary or ordered by a court to be paid in a judicial proceeding instituted by the Secretary. Further you should understand that the Department is speaking only for itself and only with regard to the issues discussed above; the Department has no authority to restrain any third party or any other governmental agency from taking any action it may deem appropriate....

Please also be advised that pursuant to section 3003(c) of ERISA, 29 U.S.C. § 1203(c), the Secretary of Labor is required to transmit to the Secretary of the Treasury information indicating that a prohibited transaction has occurred. Accordingly, this matter will be referred to the Internal Revenue Service.

We hope this letter will be helpful to the Plan fiduciaries in the execution of their fiduciary duties, and that, in respect to the specific matters discussed, they will promptly take appropriate corrective action. Please advise me, in writing, within 20 days of your receipt of this letter what action the Plan fiduciaries intend to take to correct the violations described above....

Pltf. S.J.Mtn.Ex.F pp. 6–9.

On February 11, 1993, the same day it received PWBA's letter, Citywide redeemed the CDs in question, purchased a Citywide Bank CD for $100,000 and transferred the balance of the funds to Colorado State Bank, custodian of the Plan assets. Pltf. S.J.Brief p. 4; Def. Cross-motion for S.J. Ex.D, p. 1; Ex.F, p. 1. The balance of the cash from the sale of the CDs was used to purchase "SEI Government Portfolio shares." Def. Cross-motion for S.J. Ex. F, p. 1

In an unsigned letter dated March 15.1993, Citywide's attorney advised the Secretary of its:

proposed resolution with respect to the issues raised with respect to the holding of

employer security by the Citywide Bank of Denver Profit–Sharing Plan.

As we have discussed, the potential issue with respect to investment in certificates of deposit has been resolved by the transfer of certificates of deposit to Colorado State Bank.

Citywide's Opp. Brief, Ex. K.

On March 31, 1993, the PWBA responded to Citywide's March 15th letter:

I have received your unsigned letter dated March 15, 1993 concerning the ... Plan....

As I noted, this office has concluded its investigation of the Plan and of the activities of Charles Sillstrop, Jean Warren, and [Citywide] as fiduciaries to the Plan. Based on the facts gathered during that investigation it appeared that [the Plan, fiduciaries] violated their fiduciary obligations to the Plan and violated several provisions of ERISA. The specific actions taken which we believe violated ERISA were detailed in my previous letters.

In your letter dated March 15, 1993, you stated that the potential issue with respect to the Plan's investment in [Citywide] certificates of deposit has been resolved by the transfer of certificates of deposit to Colorado State Bank.

.  .  .  .  .

Upon receipt of documentation that the [Citywide] certificates of deposit were reduced to below $100,000, and documentation of the transfer of the funds into Colorado State Bank certificates of deposit, the Department will take no further action with respect to issues concerning [Citywide] certificates of deposit....

We hope this letter will be helpful to the Plan fiduciaries in the execution of their fiduciary duties, and that, in respect to the specific matters discussed, they will promptly take the appropriate corrective action proposed in your March 15, 1993 letter. Please provide this office, within 20 days of your receipt of this letter with

documentation that the proposed corrective action has occurred....

Citywide's Opp. Brief, Ex. L.

The next communication proffered by the parties is the PWBA's letter to Citywide dated October 14, 1993 concerning "Notice of Assessment of ERISA Section 502($l$) Civil Penalty in the Matter of Citywide Bank of Denver Profit Sharing Plan." Pltf's. MSJ, Ex. H. The letter stated, in pertinent part:

[T]his office has concluded its investigation of the Plan and the activities of Citywide Bank of Denver as a Plan fiduciary. Based on the facts gathered during that investigation we concluded that, as fiduciaries, Citywide Bank of Denver, Charles Sillstrop, and Jean Warren violated their fiduciary obligations to the Plan and violated several provisions of ERISA. The specific actions taken which violate ERISA were detailed in my previous letters.

My previous letters offered you an opportunity to obtain a release from certain further action, other than the imposition of the civil penalty required by ERISA section 502($l$), by correcting the ERISA violation(s) and restoring losses to the Plan. Based on letters to this office from [Citywide's counsel] dated March 15, 1993 and April 16, 1993, we understand that you have taken such action in response to this offer. Specifically, you took the following action:

1) As requested in our February 5, 1993 letter to Bruce Muir, on February 11, 1992, you redeemed Certificates of Deposit (CD) numbers 3195 and 3206 totalling $386,706.87, and purchased CD number 3217 for $100,000, reducing the amount of CD's held at Citywide by $286,706.87 to the $100,000 level insured by the [FDIC]. Since you have taken the agreed-upon corrective action with respect to the specific violations detailed in the letters of October 30, 1992, February 5, 1993, and March 31, 1993, the Department will take no further action with respect to these matters except the imposition of the civil penalty as required by ERISA section 502($l$)....

Therefore, based on the authority granted to the [PWBA] under section 502($l$) of ERISA and the regulations thereunder,

PWBA is assessing a civil penalty of $57,-341.37 against you....

\* \* \* \* \* \*

Since you have taken the agreed-upon corrective action with respect to the specific violations detailed in the letters of October 30, 1992, February 5, 1993, and March 31, 1993, the Department will take no further action with respect to these matters, except the imposition of the civil penalty as required by ERISA section 502(*l*).

Def. Cross-motion for SJ, Ex. F, pp. 1–2.

*LAW*

▇▇▇ A settlement agreement is a contract between two parties. The law favors compromise and settlement and such a resolution will typically be sustained by the court. *R.T.C.v. Avon Center Holdings, Inc.,* 832 P.2d 1073, 1075 (Colo.App.1992). As a contract, a settlement agreement is construed using ordinary principles of contract interpretation. *Anthony v. United States,* 987 F.2d 670, 673 (10th Cir.1993); *Avon Center,* 832 P.2d at 1075. A settlement agreement need not be in writing. *South Carolina Ins. Co. v. Fisher,* 698 P.2d 1369, 1372 (Colo.App. 1984). Settlement agreements comprised of a series of letters or other documents are valid. *Devine v. Ladd Petroleum Corp.,* 743 F.2d 745 (10th Cir.1984).

The essential elements of a settlement agreement are "a definitive offer and acceptance, consideration, and parties who have the capacity and authority to agree...." 15A Am.Jur.2d *Compromise and Settlements* §§ 7, 32–33 (1976). In Colorado, settlements result from "a meeting of the minds and an exchange of sufficient consideration." *Van Schaack Holdings, Ltd. v. Fulenwider,* 798 P.2d 424, 431 (Colo.1990). To establish the existence of a contract, the parties thereto must agree upon all essential elements. *Federal Lumber Co. v. Wheeler,* 643 P.2d 31 (Colo.1981). Unless there is a meeting of the minds, there is no contract. *Lincoln Liberty Life Ins. Co. v. Martinez,* 134 Colo. 75, 299 P.2d 507 (Colo.1956). Acceptance of an offer must be of the identical terms of the offer, and in the manner, if any, specified in the offer, without any changes. *Nucla Sanitation Dist. v. Rippy,* 140 Colo. 444, 344 P.2d 976 (1959). If the acceptance modifies the proposition in any particular, it amounts to nothing more than a counter-proposal and is not an acceptance which will complete the contract. *Id.* at 449, 344 P.2d 976. The existence of a contract is a question of fact to be determined by consideration of all facts and circumstances. *I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 713 P.2d 882 (Colo. 1986).

Here, defendants characterize the February 5, 1993 letter as an offer. Specifically, they point to the following language:

In connection with the Plan's holding of deposits with [Citywide], we suggest that the following action be taken:

1. Provide this office with information concerning the cease-and-desist order issued to [Citywide], any agreements [Citywide] has with the FDIC, and whether [Citywide] meets regulatory capital requirements.

2. Provide this office with any written documentation provided to the Plan which discusses whether "pass-through" insurance coverage is provided to employee benefit plan deposits with [Citywide].

3. Provide this office with documentation of the current balances of all CD's or other deposits the Plan has with Citywide. In addition, if any participant has directed his or her account balance to be invested in deposits of [Citywide], please provide documentation of that participant direction.

4. If the Plan holds greater than 100,000 (sic) in deposits with [Citywide], that amount should be reduced to no higher than 100,000 (sic), so as to be covered by FDIC insurance. In addition, if the Plan holds greater than $100,00 in any FDIC insured institution which cannot accept brokered deposits, the Plan fiduciaries should obtain a written statement from that financial institution which discusses whether deposits at that institution are provided with "pass-through" insurance coverage.

5. Provide this office with all documentation concerning any reduction in the amount of Plan funds deposited with [Citywide].

In addition, according to defendants they offered to take "no further action with regard to these issues" if the Plan fiduciaries took the corrective action suggested in the letter. Def. Reply to Pltf.'s MSJ, p. 7–8; Ex. C, p. 8.

Citywide states that the February 5, 1993 letter cannot be construed as an offer because there was no meeting of the minds, no consideration, and no mutuality of obligation. Citywide emphasizes that its action in "voluntarily redeeming the CDs immediately upon being notified of a potential problem" was not an acceptance of any offer by the PWBA, but rather was undertaken in an "abundance of caution" to avoid any problems with the Plan investments. Pltf's MSJ, p. 14. Citywide also points to the "tone of the letter ... [as] a speculative [offer], offering mere suggestions of impropriety and possible repercussions." *Id.*

The letters exchanged between the parties contain the following language:

> *[i]t is our view* ... that after December 19, 1992, the Plan's holding of deposits in Citywide Bank of Denver in excess of the $100,000 insured by the FDIC would be a violation of ERISA. In connection with the Plan's holding of deposits with [Citywide] *we suggest that the following action be taken:*
>
> .   .   .   .   .
>
> (4) If the Plan holds greater than $100,000 in deposits with Citywide Bank of Denver, *that amount should be reduced* to no higher than $100,000, so as to be covered by FDIC insurance....
> *We have provided the foregoing statement of our views to help* Mr. Sillstrop, Ms. Warren, [Citywide], and Mr. Kennedy *to evaluate* their obligations as fiduciaries within the meaning of ERISA. Should they fail *to take the corrective action we have suggested,* this matter *may* be referred to the Office of the Solicitor of Labor for *possible* legal action....
> [I]f the Plan fiduciaries take the *corrective action suggested* above and in my previous letter, the Department will take no further action with regard to these issues either by bringing a law suit or ... by furnishing

information concerning the substance of our investigation to third parties.

> We *hope* this letter *will be helpful* to the Plan fiduciaries in the execution of their fiduciary duties, and that, in respect to the specific matters discussed, they will promptly take appropriate corrective action. Please advise me, in writing, within 20 days of your receipt of this letter what action the Plan fiduciaries intend to take to correct the violations described above....

Pltf. S.J.Mtn.Ex.F pp. 6–9 (emphasis added).

In a March 15, 1993, Citywide's attorney advised the Secretary of Citywide's:

> *proposed* resolution with respect to the issues raised with respect to the holding of employer security by the Citywide Bank of Denver Profit–Sharing Plan.
>
> As we have discussed, the *potential issue* with respect to investment in certificates of deposit has been resolved by the transfer of certificates of deposit to Colorado State Bank.

Citywide's Opp. Brief, Ex. K (emphasis added).

On March 31, 1993, the PWBA responded to Citywide's March 15th letter:

> As I noted, this office has concluded its investigation of the Plan and of the activities of Charles Sillstrop, Jean Warren, and [Citywide] as fiduciaries to the Plan. Based on the facts gathered during that investigation it *appeared* that [the Plan fiduciaries] violated their fiduciary obligations to the Plan and violated several provisions of ERISA. The specific actions taken which *we believe* violated ERISA were detailed in my previous letters.
>
> In your letter dated March 15, 1993, you stated that the potential issue with respect to the Plan's investment in [Citywide] certificates of deposit has been resolved by the transfer of certificates of deposit to Colorado State Bank.
>
> .   .   .   .   .
>
> Upon receipt of documentation that the [Citywide] certificates of deposit were reduced to below $100,000, and documentation of the transfer of the funds into Colorado State Bank certificates of deposit, the

Department will take no further action with respect to issues concerning [Citywide] certificates of deposit. . . .

*We hope* this letter will be *helpful* to the Plan fiduciaries in the execution of their fiduciary duties, and that, in respect to the specific matters discussed, they will promptly take the appropriate corrective action proposed in your March 15, 1993 letter. Please provide this office, within 20 days of your receipt of this letter with documentation that the *proposed* corrective action has occurred. . . .

Citywide's Opp. Brief, Ex. L. (emphasis added).

In light of the applicable summary judgment standards and the precatory language employed in the letters exchanged, I find that a reasonable trier of fact could not return a verdict for the defendants that a contract was formed by the letters exchanged. Further, the defendants' repeated use of precatory language in the letters demonstrates that there was no definite offer upon which the parties could have had a meeting of the minds. Thus, no contract or settlement agreement was formed by the parties' exchange of letters. *Lincoln Liberty Life. Ins. Co.*, 134 Colo. 75, 299 P.2d 507 (1956).

As stated in section III A(3), *supra*, it is undisputed that there was no judicial proceeding instituted by the Secretary. Thus, pursuant to section 502(*l*), there is no statutory basis for the Secretary to impose a civil penalty against Citywide. Accordingly, I will grant plaintiff's cross motion for summary judgment and deny defendants' motion for summary judgment on claim one.

## B. *SJ ON CITYWIDE'S CLAIM 2 THAT DEFENDANTS' ACTIONS WERE AN ABUSE OF DISCRETION*

Having granted summary judgment in favor of Citywide on claim one, there is no penalty due to the DOL. Thus, I need not decide whether defendants' abused their discretion in deciding not to reduce or waive the civil penalty ultimately imposed on Citywide pursuant to § 502(*l*). Accordingly, the motions for summary judgment on claim two are denied as moot.

## C. *MOTION TO STRIKE EXHIBIT*

Also pending is Citywide's motion to strike an exhibit. DOL attached to its reply to Citywide's response to DOL's cross-motion for summary judgment a letter from Terry Youngblood, a lawyer in the FDIC, to Alexander Fernandez, DOLs counsel of record in this case. Ex. C. In the letter, Youngblood opined on the effect of the Cease and Desist Order on Citywide's ability to accept brokered deposits. I did not read or rely on Exhibit C in deciding the issue of whether Citywide was able to accept brokered deposits. Accordingly, I will deny as moot, Citywide's motion to strike Exhibit C.

Accordingly, IT IS ORDERED that:

1. plaintiff's motion for summary judgment on claim one is GRANTED;

2. plaintiffs motion for summary judgment on claim two is DENIED as moot;

3. defendants' cross-motion for summary judgment on plaintiff's claims is DENIED;

4. plaintiff's motion to strike exhibit is DENIED as moot;

5. plaintiff having been afforded full relief, final judgment shall enter DECLARING that Citywide bears no liability for § 502(*l*) penalties imposed against it by defendant and defendants are ENJOINED and RESTRAINED from taking further action to enforce the same;

6. Citywide is awarded its costs; and

7. an award of attorney fees, pursuant to 29 U.S.C. § 1132(g)(1), shall be determined upon separate motion, if any, to be filed by plaintiff within 10 days from the date of this Order. If filed, defendants shall have 10 days to respond.