Bob SUMEREL; Sallie Sumerel; Steven M. Berzin; Ann C. Berzin; Dane W. Dicke; Kerry S. Dicke; and Bart Kaufman, as trustee for the Grantor Retained Income Trust, Plaintiffs–Appellees,

v.

GOODYEAR TIRE & RUBBER COMPANY, an Ohio corporation, Defendant–Appellant.

No. 07CA2465.

Colorado Court of Appeals, Div. VII.

May 28, 2009.

Rehearing Denied July 9, 2009.

Certiorari Dismissed Sept. 28, 2009.

Holland & Hart, LLP, Stephen G. Masciocchi, David L. Black, Denver, Colorado; William W. Maywhort, Colorado Springs, Colorado; J. Lee Gray, Greenwood Village, CO, for Plaintiffs–Appellees.

Davis Graham & Stubbs, LLP, Andrew M. Low, Geoffrey C. Klingsporn, Terry R. Miller, Denver, CO, for Defendant–Appellant.

Opinion by Judge GABRIEL.

Defendant, Goodyear Tire & Rubber Company (Goodyear), appeals from the district court's order holding that Goodyear had entered into a valid and enforceable settlement agreement with Bob and Sallie Sumerel, Steven and Ann Berzin, Dane and Kerry Dicke, and Bart Kaufman (collectively plaintiffs). Because we conclude that the November 2, 2006 e-mail and erroneous charts that Goodyear's counsel sent to plaintiffs' counsel did not constitute an offer capable of acceptance, and because even if there were such an offer, any agreement based on it would be unenforceable, we reverse and remand to allow the parties to file a satisfaction of judgment for the amounts already paid by Goodyear.

## I. Background

The facts before the district court were largely uncontested, and in the one instance where there was a dispute, the court assumed the truth of the facts as asserted by Goodyear. The undisputed and assumed facts are as follows:

In 2002, plaintiffs and two entities successfully tried a products liability action against Chiles Power Supply Company, which is not a party to this appeal, and Goodyear, which designed and manufactured a defective hose that was installed in plaintiffs' and the two entities' heating systems. After trial, the jury awarded plaintiffs and the two entities approximately $1.3 million against Goodyear, including, as applicable to plaintiffs and the two entities, repair and replacement costs, diminution in value damages, and "other costs and losses" incident to having to repair and replace their heating systems. In addition, the jury found that Goodyear was responsible for 36% of such "other costs and losses" suffered by the Berzins and Dickes and 48% of those incurred by the Sumerels and Mr. Kaufman.

The district court entered judgment on the jury's verdict and awarded prejudgment interest on the repair costs but not on the "other costs and losses" awarded to plaintiffs. Both sides then appealed. Specifically, plaintiffs appealed, among other things, the court's decision not to award prejudgment interest with respect to the "other costs and losses" awarded them. Goodyear appealed, among other things, the award of the "other costs and losses" damages. As pertinent here, a division of this court upheld the award of "other costs and losses" to plaintiffs and further held that plaintiffs were entitled

to prejudgment interest on those damages. *Sumerel v. Goodyear Tire & Rubber Co.,* 2005 WL 1476425 (Colo.App. No. 02CA1997, June 23, 2005) (not published pursuant to C.A.R. 35(f) ). The division, however, remanded the case to the district court "to determine from the existing record the proper accrual dates for prejudgment interest on other costs and losses" and to calculate and award such interest. *Id.*

After the case was remanded, Goodyear's lead attorney, Roger Thomasch of Ballard Spahr Andrews & Ingersoll, LLP, discussed with plaintiffs' lead attorney, William Maywhort of Holland & Hart LLP, a potential compromise on the applicable accrual dates. Thomasch proposed certain accrual dates and advised Maywhort of the amount of prejudgment interest that would result from using these proposed dates. Thomasch's calculation of these amounts took into account the jury's 36% and 48% allocations of fault, and Thomasch expressly conveyed that fact to Maywhort.

Following up on the discussion between Thomasch and Maywhort, co-counsel for plaintiffs, Lee Gray, an associate at Holland & Hart, called Michael Brooks of Wells Anderson & Race, co-counsel for Goodyear. Although the parties appear to have agreed on the applicable accrual dates with little difficulty, they had trouble getting their calculations of prejudgment interest based on these dates to match. Thus, in mid-October 2006, Brooks advised Gray that his calculations showed a total amount owed by Goodyear of approximately $2.7 million. At some point within the following few days, Gray responded that this amount appeared to be larger than his own estimates by "about six figures." Gray did not elaborate or share any more information regarding his calculations.

After attempting to determine the source of the discrepancy, on October 23, 2006, Brooks called Gray and speculated that the "six-figure" discrepancy may have resulted from a failure by plaintiffs to include in their calculations the full amount of post-judgment interest applicable to Mr. Kaufman, who had been awarded additional sums as a result of the prior appeal. Gray responded, "[T]hat could be it," "[T]hat might be it," or words to that effect. Brooks took from Gray's response that Gray either agreed or had no basis to disagree that Brooks had found the source of the discrepancy, although the parties had not yet exchanged their respective calculations. Without Gray's calculations, Brooks could not be sure whether he had, in fact, resolved the discrepancy.

Believing that he may have discovered the source of the discrepancy, however, on November 2, 2006, Brooks sent Gray an e-mail, stating, "Here are our charts providing the numers [sic] that Goodyear believes are appropriate.... Please review these, then let's discuss." Attached to this e-mail were charts that reflected Goodyear's then existing calculations as to the total amounts due to each plaintiff.

After reviewing these charts, Maywhort noticed that Goodyear's calculations did not agree with plaintiffs' numbers. Moreover, as plaintiffs concede, plaintiffs' counsel recognized that Goodyear's calculations had failed to reduce the damages for "other costs and losses" according to the jury's finding that Goodyear was only liable for 36% of the Berzins' and Dickes' and 48% of the Sumerels' and Mr. Kaufman's "other costs and losses." Instead, Goodyear's calculations were erroneously based on an allocation of 100% of those costs and losses to Goodyear. This was in contrast to other categories of damages set forth in Goodyear's charts, in which Goodyear had correctly applied the jury's fault allocations. Goodyear's error resulted in an overstatement of the damages due by more than $550,000.

Plaintiffs' counsel did not call this obvious error to Brooks's attention or to the attention of any other representative of Goodyear. Instead, Maywhort later claimed that he and his firm had surmised that since Goodyear alone had invited the jury to award "other costs and losses," Goodyear may have concluded that it was solely responsible for any such damages awarded. Maywhort took this position even though (1) the parties had tried the allocation of fault issue and the jury had allocated only 36% and 48% of such losses to Goodyear, and (2) Maywhort had previously discussed prejudgment interest calculations

with Thomasch, Thomasch provided calculations that were based on the correct allocated fault percentages, and Thomasch called these allocations to Maywhort's attention.

Gray, in contrast, attributed the more than $550,000 overstatement of damages to a possible desire on Goodyear's part to "sweeten the pot." As noted above, however, the jury had already determined liability, and the record shows that the parties were not negotiating the amounts due but rather were attempting to determine why there was a discrepancy in their mathematical calculations. Accordingly, the record belies the existence of any pot to be sweetened.

Ultimately, neither Gray nor any of plaintiffs' co-counsel called Brooks to discuss his charts, as Brooks had requested. Rather, Maywhort, who had not been directly involved in the more recent discussions regarding the calculations, left a voicemail message for Thomasch, who also had not been directly involved, stating that plaintiffs accepted Goodyear's November 2, 2006 "offer." Maywhort then followed his voicemail with a fax confirming plaintiffs' acceptance of that purported "offer." Notably, neither Maywhort nor Gray informed Brooks of plaintiffs' "acceptance," nor was Brooks copied on Maywhort's fax to Thomasch.

Thereafter, Brooks and Gray discussed, among other things, whether the parties needed a settlement agreement or release, or whether a satisfaction of judgment would suffice to conclude the case. They agreed on the latter, and Brooks prepared a form of satisfaction of judgment that he sent to Gray on November 16, 2006, with a notation that the document was a draft for discussion purposes only. That same day, before anyone had signed the satisfaction of judgment, Brooks realized the error in his earlier calculations. He immediately called the error to Gray's attention and sent Gray corrected versions of the charts and a revised satisfaction of judgment with corrected numbers.

Rather than acknowledging the error, signing the revised satisfaction, and concluding the action for the amounts actually awarded by the jury, Gray indicated that he needed to consult with his colleagues and would get back to Brooks. Then, on November 21, 2006, Maywhort wrote Brooks and demanded that Goodyear adhere to the parties' alleged agreement, which would have resulted in plaintiffs' receiving over $550,000 more than what was due them. When Goodyear refused to do so, plaintiffs filed a motion to enforce the purported "settlement agreement." The district court granted plaintiffs' motion, and Goodyear now appeals, having paid, and plaintiffs having accepted, the amounts that the parties agreed were due and owing, without prejudice to plaintiffs' claims for the additional amounts.

## II. Existence of an Offer

Goodyear first argues that the district court erred by concluding that Goodyear and plaintiffs formed a valid and enforceable agreement because the November 2, 2006 e-mail and erroneous charts that Brooks sent to Gray did not constitute an offer. We agree.

 In contract cases, when the facts are undisputed and the pertinent documents are before us, we are not bound by the district court's findings and conclusions and may resolve the issues as a matter of law. *See Connell v. Sun Oil Co.*, 42 Colo.App. 311, 313, 596 P.2d 1215, 1216 (1979); *see also Bolser v. Bd. of Comm'rs*, 100 P.3d 51, 53 (Colo.App.2004) ("[B]ecause the judgment here was entered based upon stipulated facts and documentary evidence, we are obligated to make an independent judgment on the merits."). We review matters of law de novo. *Microsemi Corp. v. Broomfield County Bd. of Equalization*, 200 P.3d 1123, 1124–25 (Colo.App.2008).

Here, as noted above, the facts relevant to plaintiffs' motion to enforce were largely uncontested, and where there was a dispute, the district court assumed the truth of the facts as asserted by Goodyear. The court then ruled on the basis of the undisputed facts as set forth in the documentary evidence and the parties' affidavits. In light of this procedure, for the reasons stated above, we review de novo the question of whether Brooks's e-mail and erroneous charts constituted an offer. *See Bolser*, 100 P.3d at 53;

*Connell,* 42 Colo.App. at 313, 596 P.2d at 1216.

■ "A court may only enforce a settlement agreement if it constitutes an enforceable contract." *Yaekle v. Andrews,* 195 P.3d 1101, 1111 (Colo.2008). A contract is formed when one party makes an offer and the other accepts it, and the agreement is supported by consideration. *Marquardt v. Perry,* 200 P.3d 1126, 1129 (Colo.App.2008).

■ "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (2008), *quoted in Castle Rock Constr. Co. v. Dep't of Transp.,* 74 P.3d 491, 493 (Colo.App.2003), *and cited with approval in Indus. Prods. Int'l, Inc. v. Emo Trans, Inc.,* 962 P.2d 983, 988 (Colo.App.1997); *see also Soto v. Progressive Mountain Ins. Co.,* 181 P.3d 297, 302 (Colo.App.2007) (defining an offer as " '[t] he act or instance of presenting something for acceptance' ") (quoting *Black's Law Dictionary* 1112 (8th ed.2004) ).

■ Settlement offers must be definitive. *Citywide Bank v. Herman,* 978 F.Supp. 966, 977 (D.Colo.1997). Moreover, even where there is unequivocal language suggesting that an offer is intended, such language cannot be taken in isolation from other, qualifying language in the document. *Bourque v. FDIC,* 42 F.3d 704, 709 (1st Cir.1994). Indeed, where both unqualified and qualified statements exist, the qualification is likely to control. *Id.*

The First Circuit applied this principle in *Bourque,* 42 F.3d at 706–12. In *Bourque,* the plaintiff offered to purchase certain real property from the FDIC. *Id.* at 706. The FDIC rejected the plaintiff's offer but made an express "counter offer" and told the plaintiff that if he wished to accept it, he should return a form of purchase and sale agreement that was provided. *Id.* The FDIC further advised the plaintiff that all offers were subject to FDIC approval. *Id.* The plaintiff signed the agreement provided, but the FDIC then received a more attractive offer and refused to sell the property to the plaintiff unless he matched that offer. *Id.* at 706–

07. The plaintiff refused and sued to enforce the agreement, but the court rejected his request, concluding that the counteroffer was not an offer that the plaintiff could accept, because, as here, further discussion was contemplated. *Id.* at 711–12 (additional FDIC approval was required). The court thus construed the FDIC's counteroffer as an invitation to the plaintiff to make an offer in the amount set forth in the FDIC's counteroffer. *Id.* at 712; *see also Citywide Bank,* 978 F.Supp. at 979 (holding that a defendant's use of qualifying language, such as *"proposed resolution," "potential issue,"* and *"We hope this letter will be helpful,"* demonstrated that there was no definitive offer).

■ Further, there is no offer properly capable of acceptance where the purported offeree "knows or has reason to know that the person making [the purported offer] does not intend to conclude a bargain until he has made a further manifestation of assent." Restatement (Second) of Contracts § 26 (1981). Indeed,

[i]f the addressee of a proposal has reason to know that no offer is intended, there is no offer even though he understands it to be an offer. "Reason to know" depends not only on the words or other conduct, but also on the circumstances, including previous communications of the parties and the usages of their community or line of business.

*Id.* § 26 cmt. a. Thus, in *Nations Enterprises, Inc. v. Process Equipment Co.,* 40 Colo. App. 390, 394, 579 P.2d 655, 658 (1978), a division of this court held that a letter proposing to supply certain goods but recognizing that further negotiations between the parties were necessary did not constitute an offer capable of acceptance. Instead, it constituted preliminary negotiations soliciting an offer from the opposing party. *Id.*

■ Applying these principles here, we conclude that Goodyear's November 2, 2006 e-mail and attached erroneous charts did not constitute an offer that was properly capable of acceptance. Accordingly, we hold for several reasons that there was no agreement that could be enforced.

First, the e-mail and charts were sent in a context in which the parties were attempting to complete a mathematical computation but had a discrepancy in their respective calculations, which Brooks was attempting to resolve. Specifically, by the time the e-mail and charts were sent, the parties had already reached agreement on the relevant accrual dates. Accordingly, the record demonstrates that the parties were not negotiating dollar amounts or anything else at this point in time. Rather, they were beginning to exchange mathematical calculations based on the agreed accrual dates, while simultaneously attempting to identify the six-figure discrepancy in those calculations. Thus, Brooks's e-mail, using qualifying and indefinite language, noted that the calculations were what "Goodyear *believes* are appropriate" (emphasis added). *See Citywide Bank,* 978 F.Supp. at 977–79 (use of qualifying language showed no definitive offer).

Second, Brooks's e-mail did not solicit an acceptance but rather solicited a return call: "Please review these, then let's discuss." Accordingly, on their face, Brooks's e-mail and charts represented a continuation of the parties' preliminary discussions, particularly as to their effort to determine the source of the discrepancy in their respective calculations. *See Nations Enters.,* 40 Colo.App. at 394, 579 P.2d at 658 (letter recognizing need for further negotiations was not an offer); Restatement (Second) of Contracts § 24 (offer must justify another in understanding that his assent is invited and will conclude a bargain).

For these reasons alone, Brooks's e-mail and charts did not constitute an offer capable of acceptance.

■ Our conclusion finds additional support in the "well-settled rule" that "an offeree may not snap up an offer that is on its face manifestly too good to be true." *See Lange v. United States,* 120 F.2d 886, 889 (4th Cir.1941) (citing 1 *Williston on Contracts* § 94 (1936), and Restatement (First) of Contracts § 71(c) (1932) ); *accord Speckel v. Perkins,* 364 N.W.2d 890, 893 (Minn.Ct. App.1985); *Limestone Realty Co. v. Town & Country Fine Furniture & Carpeting, Inc.,* 256 A.2d 676, 679 (Del.Ch.1969). In *Speckel,* 364 N.W.2d at 893–94, for example, an attorney sent a letter to opposing counsel regarding a potential settlement agreement. In this letter, the attorney stated that the case at issue was not worth the policy limits of $50,000. The letter, which was dictated but not read, then proceeded to offer $50,000, rather than the $15,000 that the attorney had intended to offer. Although opposing counsel formally accepted the $50,000 offer, the court held that there was no offer capable of acceptance, because the letter on its face raised a presumption of error, due to its internal inconsistency, as well as a consequential duty on the recipient's part to inquire. *Id.* at 894. Similarly, in *Limestone Realty,* 256 A.2d at 679, a lessee, despite his suspicions that a release had been sent to him in error and his knowledge that he was not entitled to the release, immediately executed the document and then tried to enforce it. The court rejected the lessee's attempt to do so, noting that "he should have known [an offer] was unintended and on its face was too good to be true," and holding, "Such an offer is not susceptible of acceptance." *Id.*

In our view, the present case is a prototype for a purported offer that was "on its face manifestly too good to be true." The jury had already spoken, and the parties had agreed on the relevant accrual dates. All that should have been left was a simple mathematical calculation. Moreover, when plaintiffs' counsel received Goodyear's calculations, they immediately recognized that Brooks's calculations assumed that Goodyear was 100% liable for the "other costs and losses," rather than the 36% and 48% allocation of fault that the jury had found, resulting in an error in their favor of over $550,000. On these undisputed facts, we conclude that Brooks's e-mail and erroneous charts raised a presumption of error because they were inconsistent with (1) the jury's award; (2) Thomasch's prior discussion with Maywhort, in which Thomasch specifically pointed out that the calculations that he had provided were based on the percentages of fault that the jury had allocated to Goodyear; and (3) other calculations in the same charts, in which Goodyear consistently used the jury's allocations of fault. At a minimum, these obvious inconsistencies gave rise to a

duty on the part of plaintiffs' counsel to inquire before attempting to accept the purported "offer." *See Speckel,* 364 N.W.2d at 893–94. Without such an inquiry, there was no offer capable of acceptance here. *See Limestone Realty,* 256 A.2d at 679.

Notwithstanding the foregoing, plaintiffs contend that Goodyear's conduct after plaintiffs purported to accept Brooks's alleged November 2, 2006 offer belies Goodyear's argument that it never made a valid offer. We reject this contention for several reasons.

■ First, plaintiffs note that Goodyear did not immediately deny that the e-mail and charts constituted an offer and then included the erroneous calculations in a draft satisfaction of judgment. Such conduct by Goodyear, however, does not change the fact that, for the reasons discussed above, plaintiffs were not justified in treating the e-mail and charts as an offer capable of acceptance in the first place. *Cf. Newman v. Schiff,* 778 F.2d 460, 466–67 (8th Cir.1985) (holding that a purported offeror's subsequent conduct and letter stating that a news rebroadcast of an offer may have itself been an offer was indefinite and did not change the fact that the rebroadcast was merely a news report and that it was not reasonable for the hearer to construe the news report as a new offer). Nor did Goodyear's subsequent conduct constitute ratification of the alleged agreement. "Ratification serves to authorize that which was unauthorized. Ratification cannot, however, give legal significance to an act which was a nullity from the start." *Id.* at 467.

Second, even if Goodyear's subsequent conduct could be used as evidence of whether there was a valid offer here, we conclude that, on the record before us, Goodyear's conduct does not support a finding that it made an offer capable of acceptance in this case. For example, plaintiffs rely heavily on Goodyear's failure to deny the existence of an offer after Maywhort's oral and written acceptance of Goodyear's purported "offer." As stated above, however, Maywhort did not inform Brooks, who actually sent the e-mail and charts, that he was accepting the purported offer. Instead, he contacted Thomasch, who worked at a different law firm from Brooks and had not been directly involved in drafting or sending the e-mail and charts. These circumstances, created by plaintiffs' counsel, made it unlikely that either Thomasch or Brooks would have immediately denied that there was an offer, because neither would necessarily have been privy to conversations that the other may have had with plaintiffs' counsel.

. Similarly, given that Brooks and Gray had been trying to identify the source of the six-figure discrepancy in their numbers, that Brooks thought he had identified the discrepancy, and that Brooks had sent his e-mail and charts with a request for a return telephone call, Brooks could reasonably have anticipated that plaintiffs' counsel would contact him if the discrepancy was other than what he had identified earlier. Having heard nothing from plaintiffs' counsel, Brooks had no reason to believe that there was an ongoing problem. These circumstances, too, made it unlikely that Brooks would have been concerned with whether his e-mail could be construed as an offer, because the record shows that his principal focus was on concluding the matter and satisfying the judgment expeditiously.

For the foregoing reasons, we conclude that the November 2, 2006 e-mail and charts did not constitute an offer by Goodyear.

## III. Unilateral Mistake

■ Goodyear also contends that, even if its counsel's November 2, 2006 e-mail and attached erroneous charts constituted an offer, any agreement based on such an offer would be unenforceable. We again agree and thus hold, in the alternative, that any agreement reached by the parties here is unenforceable.

Regarding unilateral mistake, Professor Corbin states, "[T]here is practically universal agreement that, if the material mistake of one party was … known by the other or was of such character and accompanied by such circumstances that the other had reason to know of it, the mistaken party has the power to avoid the contract." 7 Joseph M. Perillo, *Corbin on Contracts* § 28.41, at 255 (rev. ed.2002). Corbin further states that relief due to unilateral mistake is available even if

the offeree neither knew of nor had reason to know of the mistake, if enforcement of the contract would be "oppressive" to the mistaken party, and relief from the contract "would impose no substantial hardship" on the other party. *Id.* § 28.39, at 224.

Pronouncements by our supreme court and the Restatement (Second) of Contracts are consistent with these principles. Thus, in *Powder Horn Constructors, Inc. v. City of Florence,* 754 P.2d 356, 363 (Colo.1988), the supreme court held that a contractor was entitled to equitable relief from the consequences of a bid containing mathematical or clerical errors where the errors were made in good faith and related to a material part of the bid, and where the city that received the bid had not relied to its detriment on the mistaken bid. In such circumstances, the court held that equitable relief was appropriate because the bid that was apparently accepted was not the bid that was intended and, therefore, was not a valid bid. *Id.* The supreme court further stated that the contractor was entitled to equitable relief, because, where the contractor acted in good faith and where the city knew of the mistake before accepting the bid, it would "contravene fundamental principles of fairness" to allow the city to "take advantage of [the contractor's] mistake and gain a windfall profit." *Id.* at 364.

Similarly, Restatement (Second) of Contracts §§ 153–54 (1981), which have not yet been expressly adopted in Colorado (although § 153 was cited with approval in *Powder Horn*), are fully consistent with these principles.

Restatement (Second) of Contracts § 153 provides:

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (Second) of Contracts § 154 in turn provides:

A party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

Notably, comment f to § 153 states, "It is, of course, unusual for a party to bear the risk of a mistake that the other party had reason to know of. ..." Restatement (Second) of Contracts § 153 cmt. f.

Applying these principles here, we conclude for the following reasons that even if an agreement had been formed, it was voidable under the circumstances.

First, it cannot reasonably be disputed that Goodyear's calculations were in error, and plaintiffs admit that they knew or had reason to know of the error.

Second, the purported agreement would clearly be oppressive and unconscionable, and relief from such an agreement would pose no substantial hardship on plaintiffs. Simply stated, plaintiffs are attempting to exploit Goodyear's mistake to gain a windfall of over $550,000 more than the jury in this case awarded to them. Such a windfall is most certainly oppressive to Goodyear and, in our view, would be unconscionable. Conversely, avoiding the purported agreement and awarding plaintiffs only what the jury awarded works no hardship on plaintiffs. They would receive the amount to which they are entitled.

Third, we reject plaintiffs' assertion that the risk of mistake here rested with Goodyear. As in *Powder Horn,* we perceive no basis for a determination that Goodyear did not act in good faith. Moreover, as noted above, it is unusual for a party to bear the risk of a mistake that the other party had

reason to know of. Restatement (Second) of Contracts § 153 cmt. f. Nor do we perceive any basis for concluding, as plaintiffs contend, that Brooks chose to charge ahead in conscious ignorance, believing that his limited knowledge was sufficient. The record reflects that someone had to share the first set of calculations here. Brooks did so, knowing that there was still a possible·six-figure discrepancy. Hence, he asked Gray to review the calculations and to call him to discuss the numbers. Further, as was obvious from the November 2, 2006 e-mail, Brooks was continuing to try to identify the discrepancy and, thus, was seeking further discussion. In short, the record demonstrates that Brooks did not seek an agreement through conscious ignorance. Rather, the record shows that he sought further dialogue because he knew of the discrepancy in the parties' calculations.

*Poly Trucking, Inc. v. Concentra Health Services, Inc.*, 93 P.3d 561 (Colo.App.2004), on which plaintiffs rely, does not mandate a different result. In *Poly Trucking*, 93 P.3d at 562–63, the decedent was killed in an auto accident when a truck driver had a seizure that caused his truck to strike the decedent's vehicle. The decedent's widow filed a wrongful death action against, among others, the truck driver's trucking company (Poly). *Id.* Poly then filed third-party claims against Concentra, which allegedly improperly issued a medical certification to the truck driver and whose doctors conducted the related medical examinations. *Id.* at 563. Poly did not, however, bring any third-party claims against the individual doctors, because it had been advised by counsel that Colorado lacked personal jurisdiction over those doctors. *Id.*

Poly and Concentra eventually entered into settlement discussions, and Concentra prepared various draft settlement agreements. Although Concentra's initial draft included a release of its officers, agents, and employees, it omitted this language from several subsequent drafts, even after Poly added its own related entities and employees to the release it was receiving. *Id.*

Eventually, Poly and Concentra signed a final settlement agreement omitting the individual doctors, and Poly then sued the doc-tors in Texas, which had personal jurisdiction over them. *Id.* Concentra moved to reform the settlement agreement to include a release of its doctors. *Id.* The district court reformed the agreement, but a division of this court reversed, holding that although there was a unilateral mistake, there was no basis for reformation absent inequitable conduct by Poly, which the division refused to find. *Id.*

We view *Poly Trucking* as distinguishable from this case. In *Poly Trucking*, unlike here, there was no evidence to suggest that Poly knew of Concentra's intent to obtain a release of the doctors. *Id.* at 564–66. To the contrary, Concentra provided repeated drafts of the release language that omitted the doctors, even when Poly added its own employees and others to the release. *Id.* at 563. Nor does it assist plaintiffs to argue, based on *Poly Trucking*, that contract reformation is an appropriate remedy for a unilateral mistake only if the other party engaged in fraud or inequitable conduct. Rather, this principle supports Goodyear's position here, because, in our view, plaintiffs' efforts to exploit Goodyear's obvious mathematical or clerical error, thereby obtaining a windfall of over $550,000, were clearly inequitable. *See Kish v. Kustura*, 190 Or.App. 458, 79 P.3d 337, 340 (2003) (" '[T]he range of misconduct termed "inequitable" is quite broad, varying from the most egregious and concrete, such as fraud, to more amorphous and somewhat less egregious misconduct, sometimes described as "overreaching" or "sharp practice." ' Inequitable conduct includes a party's silence where that 'party knows that the other party is materially mistaken as to a writing's scope and effect, but remains silent, hoping to take advantage of the other's mistake.' ") (citation omitted) (quoting in part *Murray v. Laugsand*, 179 Or.App. 291, 39 P.3d 241, 248 (2002), and *Pioneer Res., LLC v. D.R. Johnson Lumber Co.*, 187 Or.App. 341, 68 P.3d 233, 253 (2003)).

For these reasons, we hold that even if Brooks's November 2, 2006 e-mail and charts could be characterized as an offer and that offer was accepted, Goodyear may properly avoid the resulting agreement on the facts presented here.

## IV. Conclusion

The current phase of this litigation could, and should, have been avoided. When plaintiffs' counsel reviewed Brooks's charts, they immediately recognized the cause of the parties' six-figure discrepancy. At this point, the proper course was obvious to us: plaintiffs' counsel should have called Brooks, identified the discrepancy, and concluded the matter without further delay. Had plaintiffs' counsel done so, plaintiffs would have immediately received the considerable sums to which they were entitled, and all parties would have been spared the undoubtedly substantial expense of the current litigation over what can only be viewed as a quest by plaintiffs to obtain a substantial windfall. For the reasons set forth above, on the facts presented here, the law will not countenance the patently inequitable result that plaintiffs seek. *See, e.g., Lange,* 120 F.2d at 889.

In light of our foregoing disposition, we need not address Goodyear's remaining contention on appeal.

The order is reversed, and the case is remanded for the sole purpose of allowing the parties to file a satisfaction of judgment for the amounts already paid by Goodyear.

Judge RUSSEL and Judge J. JONES concur.