24CA0864 Stansberry v Elkerton 05-22-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0864
Weld County District Court No. 20CV30844
Honorable Todd Taylor, Judge

---

Christopher Stansberry and Cheryl Stansberry,

Plaintiffs-Appellants,

v.

Blyth Elkerton,

Defendant-Appellee.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE PAWAR
Grove, J., concurs
Berger*, J., dissents

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 22, 2025

---

Leventhal Puga Braley P.C., Jim Leventhal, Bruce L. Braley, Julia T.
Thompson, Nathaniel E. Deakins, Denver, Colorado, for Plaintiffs-Appellants

Ross-Shannon & Proctor, P.C., Bradley Ross-Shannon, Gregory F. Szydlowski,
Lakewood, Colorado, for Defendant-Appellee


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Plaintiffs, Christopher and Cheryl Stansberry, appeal the district court's judgment in favor of defendant, Blyth Elkerton. Specifically, the Stansberrys challenge the court's ruling that, before the Stansberrys filed suit against Elkerton, the parties entered into an enforceable settlement agreement that barred the Stansberrys' claims.  We affirm.

## I.    Background

¶ 2    Elkerton and the Stansberrys were involved in a motor vehicle accident that injured Christopher Stansberry.  Elkerton was insured by State Farm Mutual Automobile Insurance Company (State Farm) under a liability policy with limits of $100,000.

¶ 3    After the accident, the Stansberrys' lawyer engaged in settlement negotiations with a State Farm claims representative. The lawyer made a policy-limits demand to State Farm.

¶ 4    The claims representative responded in two emails, sent an hour apart on the same day.  Attached to the first email was a release that constituted a settlement offer.  The release provided that State Farm would pay $100,000 in exchange for releasing, discharging, and precluding any claims arising out of the accident. About an hour later, with no intervening communications, the

claims representative sent another email to the lawyer with further details about a potential settlement. This second email addressed liens held by Christopher Stansberry's medical providers and how these and any other liens would be satisfied.

¶ 5    The Stansberrys' lawyer responded two days later. She informed State Farm that there were no liens, just a subrogation interest, and that the Stansberrys would "take care of" that interest. The email then asked State Farm to make the settlement check payable to her law firm and Christopher Stansberry, and included a W9 tax form (which allowed State Farm to report to the Internal Revenue Service that it had paid the settlement funds to the law firm). The lawyer did not sign or send the release.

¶ 6    Two months later, with no signed release and no settlement check issued, the Stansberrys sued Elkerton for damages arising out of the accident. Elkerton answered that an enforceable settlement agreement barred the Stansberrys' claims. Elkerton then moved to enforce the agreement, and the district court granted the motion and dismissed the Stansberrys' claims.

¶ 7    The Stansberrys appealed, arguing that the emails described above did not establish an enforceable settlement agreement. A

division of this court reversed. *Stansberry v. Elkerton*, (Colo. App. No. 22CA1715, Oct. 12, 2023) (not published pursuant to C.A.R. 35(e)). The division explained that the emails contained conflicting evidence about whether an enforceable settlement agreement existed. *Id.* The division therefore remanded to the district court with directions to conduct an evidentiary hearing and determine whether there was an enforceable agreement. *Id.*

¶ 8     At the evidentiary hearing, the Stansberrys' lawyer and the claims representative were the only witnesses. The district court placed "little weight" on the witnesses' respective opinion testimony about whether the parties had entered into an enforceable agreement. But the court did not expressly discount other testimony the witnesses gave.

¶ 9     Ultimately, based on its assessment of the evidence, the court held that there was an enforceable settlement agreement and again dismissed the Stansberrys' claims. The Stansberrys appeal that ruling, arguing that the court erred by ruling that there was an enforceable settlement agreement.

## II. We Cannot Disturb the District Court's Ruling

### A. Standard of Review

¶ 10    The parties disagree on what standard of review applies here. Elkerton urges us to review for clear error. The Stansberrys argue that, even though the district court based its ruling on its weighing of the evidence after an evidentiary hearing, we should review de novo. We agree with Elkerton.

¶ 11    Whether an enforceable contract exists is a question of fact. *Yaekle v. Andrews*, 195 P.3d 1101, 1111 (Colo. 2008). And we review questions of fact for clear error. *See, e.g., Black v. Black*, 2018 COA 7, ¶ 87. This standard of review recognizes that, unlike us, the trier of fact is in the best position to resolve disputed factual issues, determine witness credibility, assign weight to testimony, and draw inferences from the evidence. *See Target Corp. v. Prestige Maint. USA, Ltd.*, 2013 COA 12, ¶ 24.

¶ 12    The Stansberrys recognize that whether a contract exists is ordinarily a question of fact and that we review questions of fact for clear error. Nevertheless, they assert de novo review is appropriate here under the exception articulated in *Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128 (Colo. App. 2009).

¶ 13    In *Sumerel*, the trial court ruled on the enforceability of a settlement agreement based only on affidavits and emails the parties exchanged. *Id.* at 132. The trial court did not hold an evidentiary hearing. *Id.*

¶ 14    On appeal, a division of this court reviewed de novo. *Id.* The division explained that this was appropriate because the facts were undisputed and the pertinent documents were before it. *Id.* Effectively, the *Sumerel* division was in the exact same position as the trial court to review the relevant evidence and determine whether an agreement existed. We cannot say the same here.

¶ 15    Unlike *Sumerel*, the facts here were disputed and the district court held an evidentiary hearing to resolve them. After hearing the evidence, the court made credibility determinations, weighed the evidence, and determined that there was an enforceable agreement based on those assessments. Consequently, unlike the *Sumerel* division, we are not just as well positioned as the district court to assess the evidence.

¶ 16    The Stansberrys argue otherwise, urging us to follow *Sumerel* nevertheless because the district court "rejected all of the witness testimony at the evidentiary hearing and based its decision solely

on the emails and documentary evidence that was previously available . . . prior to the hearing." We disagree with this assessment of the record. The only part of the claims representative's testimony the court discounted was her "characterization as to whether the parties had reached a meeting of the minds." The court did this because the claims representative "is not a lawyer and any legal conclusions she was encouraged to make by counsel are neither persuasive nor helpful." Yet the claims representative's testimony was far broader than just this legal conclusion. Among other things, she also explained her intent in sending each of the relevant emails and her understanding of the parties' respective positions at those times and others.

¶ 17　　As for the Stansberrys' lawyer, the only portion of her testimony the court specifically discounted was her assertion that "State Farm's purported insistence on a 'hold harmless' provision [in the second email] prevented the parties from reaching a full settlement agreement." The court explicitly relied on other parts of her testimony, including that "she had accepted the payment amount and subrogation terms."

¶ 18    In sum, we reject the Stansberrys' assertion that, as in *Sumerel*, the district court's ruling was based *only* on the documentary evidence.  True, the court ruled that the documentary evidence was "the more credible evidence of the parties' state of mind and intentions."  But this does not mean that the court ignored *all* the testimony from both witnesses.

¶ 19    Moreover, even if the district court had discounted every word of testimony at the evidentiary hearing, we are unaware of any authority that would allow us to review the resulting ruling — issued after and based on an evidentiary hearing at which we were not present — de novo.  *Sumerel* does not stand for this proposition because there was no evidentiary hearing in that case.

¶ 20    For these reasons, we review the district court's ruling for clear error.  Under this standard of review, we are bound by the court's determination as long as it is supported by competent evidence in the record.  *Yaekle*, 195 P.3d at 1111.  We cannot reweigh the evidence or substitute our judgment for that of the trier of fact.  *Id.*

## B. Some Competent Evidence Supports the Ruling Below

¶ 21 An enforceable contract is formed when the parties mutually assent to its terms and there is bargained-for consideration. *Univ. of Denver v. Doe*, 2024 CO 27, ¶ 47. Often, mutual assent occurs when an offeror makes an offer and an offeree accepts it. *See Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008). Acceptance happens when an offeree engages in "words or conduct that, when objectively viewed, manifests an intent to accept an offer." *Id.*

¶ 22 In its ruling, the district court focused on the effect of the three emails discussed above: the two sent by the claims representative on the same day and the Stansberrys' lawyer's response two days later. The district court found offer, acceptance, and mutual assent to the material terms of the settlement agreement in these emails. The terms of the agreement, according to the district court, were that State Farm would pay the Stansberrys the full policy limit of $100,000 in exchange for the release of all claims and the Stansberrys would be responsible for satisfying any outstanding subrogation interests.

¶ 23    The Stansberrys argue that this was error because the two State Farm emails constituted two materially different offers, with the second offer rendering the first offer legally void and impossible to accept.  They contend that their lawyer's response was directed to the first offer, which was no longer on the table once it was superseded by the claims representative's second email.  Thus, according to the Stansberrys, there was no acceptance of a legally valid offer.  We disagree because we conclude that there was at least some competent evidence in the record that State Farm's two emails constituted a single offer, the terms of which the lawyer accepted in her response.

¶ 24    Nobody disputes that State Farm's first email offered $100,000 in exchange for the release of all claims against Elkerton, known or unknown, including those based on liens or subrogation interests. Then came the second email:

> Please also note, we are outstanding the final Conduent Lien.  This document is necessary in order for State Farm to issue payments accordingly when the signed release is returned.
>
> However, if this document is either unavailable or your office would rather request for payments in full, including payments for the

known liens, State Farm requires a letter that confirms Mr. Christopher Stansberry will agree to hold harmless State Farm Insurance, Mr. Blyth Elkerton and Mrs. Cheryl Elkerton from, and indemnify it for, any other claims from any medical providers, hospitals, health insurance carriers, or other payers of medical bills for treatment provided to her/him for the bodily injuries he/she sustained on August 31st, 2019.

¶ 25    Two days later, the Stansberrys' lawyer responded: "The language in the Release covers the Conduent subrogation interest. There is no lien.  We will take care of the subrogation interest.  Here is a W9.  Please make the check payable to [my law firm] and Christopher Stansberry."

¶ 26    Both of State Farm's emails provided that State Farm would pay $100,000 in exchange for not being liable for any further claims arising out of the accident.  Both emails also contemplated that any liens or subrogation interests would be paid out of State Farm's $100,000 policy-limits payment.  State Farm's second email did not alter these terms or suggest new ones.  Instead, the second email simply asked whether the Stansberrys would like State Farm to pay medical providers directly or if the Stansberrys would like to pay the medical providers themselves.  Under either option, Elkerton

would no longer be liable for any claims arising out of the accident, State Farm would still pay $100,000, and any liens or subrogation interests would be paid from that $100,000, leaving the Stansberrys with $100,000 minus the amount of the liens or subrogation interests. And despite the dissent's suggestion, neither option precluded the Stansberrys from attempting to negotiate down the amount of the subrogated interest.

¶ 27    The Stansberrys' lawyer accepted these material terms. She clarified that there was no lien and that the Stansberrys would pay the subrogation interest once State Farm paid them the full $100,000. Thus, the emails themselves are some competent evidence supporting the district court's determination that an

enforceable settlement agreement existed.[1]  We therefore perceive no clear error and must affirm the court's ruling.

### III.    Disposition

The judgment in favor of Elkerton is affirmed.

JUDGE GROVE concurs.

JUDGE BERGER dissents.

---

[1] Our reliance on the emails themselves as some competent evidence to support the district court's ruling is not in conflict with our conclusion that the district court relied on more than just the documentary evidence to resolve whether there was an enforceable agreement.  The two inquiries are separate: (1) what is the scope of the evidence the district court considered when making its determination; and (2) is there any evidence in the record that supports the court's determination.  Put another way, our conclusion that the documentary evidence constituted some competent evidence supporting the district court's ruling does not mean that the documentary evidence was the *only* evidence that the court considered or that supported the ruling.

JUDGE BERGER, dissenting.

¶ 28 The correct disposition of this appeal turns on the legal consequences of State Farm's second October 14, 2020 email. If that email made a material change or alteration of the offer contained in State Farm's first October 14, 2020 email, the offer contained in the first October 14 email terminated by operation of law.[1] Restatement (Second) of Conts. § 43 (Am. L. Inst. 1981) (Restatement); *Varney Ent. Grp., Inc. v. Avon Plastics, Inc.*, 275 Cal. Rptr. 3d 394, 403 (Ct. App. 2021) (applying section 43 to conclude that a second settlement offer containing terms materially inconsistent with the first offer impliedly revoked the first).

¶ 29 Because that offer terminated, it was incapable of acceptance and a contract could not be formed on the basis of the original offer. *Varney*, 275 Cal. Rptr. 3d at 404 (holding that the second settlement offer's revocation of the first offer "terminated [the offeree's] power to accept it"). To the extent the second October 14

---

[1] For the purposes of this analysis, it makes no difference whether the first offer was the Stansberrys' policy limits demand or the offer made by State Farm in its first October 14 email. The legal analysis is identical. For clarity, I refer to State Farm's first October 14 email as the "offer."

email created a superseding offer that was capable of acceptance, the documentary evidence conclusively demonstrates that it was not accepted by the Stansberrys.

¶ 30    State Farm's first October 14 email made a simple and unconditional offer: in return for execution of the release set forth in full in the email, State Farm would pay to the Stansberrys (not someone else) the policy limits of $100,000.  It was then up to the Stansberrys to either pay the amount claimed by the holder of the subrogation interest or enter into negotiations with the holder of the subrogation interest and resolve the amount of the subrogation interest.  This proposed release said nothing about, and plainly did not require, a separate indemnity/hold harmless provision as a condition of the settlement.

¶ 31    The second October 14 email was vastly different.  It did *not* give the Stansberrys the unconditional right to receive the $100,000 from State Farm.  Instead, it presented the Stansberrys with two options, neither of which was stated or even suggested in the first October 14 email: (1) to accept an amount *net* of the amount of the subrogated interest, *or* (2) to execute a separate indemnity agreement (nowhere addressed in the first October 14 email) to hold

14

State Farm harmless for third-party medical claims, in which case State Farm would tender the $100,000 to the Stansberrys.

¶ 32 The first option would necessarily have resulted in a payment to *the Stansberrys* of an amount less than $100,000. And because the record discloses that Christopher Stansberry's medical expenses exceeded $200,000, this option could well have resulted in the Stansberrys receiving *nothing* from State Farm. An option under which the Stansberrys would receive nothing in exchange for releasing their claims plainly was not consistent with the unconditional offer in the first October 14 email. The mere opportunity to attempt to negotiate downward the subrogation claim held by Conduent was a substantial benefit to the Stansberrys that was wholly absent from the first alternative offered by State Farm in its second October 14 email.

¶ 33 "An offeree's power of acceptance is terminated when the offeror takes definite action inconsistent with an intention to enter into the proposed contract and the offeree acquires reliable information to that effect." Restatement § 43. For the reasons I have articulated, because the second October 14 email introduced an additional, material term, it was inconsistent with an intention

15

to enter into a contract on the terms of the first October 14 email and therefore, the Stansberrys' power to accept the offer contained in the first October 14 offer was terminated. *See also* Restatement § 42 ("An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract.").

¶ 34 Multiple courts have held that an indemnity provision in a settlement agreement can be a material term, the addition of which in a subsequent offer would terminate the first. Consistent with this principle, a federal court in Massachusetts held that the inclusion of an indemnity provision in a purported acceptance introduced an additional material term that rendered the acceptance a counteroffer. *D'Agostino v. Fed. Ins. Co.*, 969 F. Supp. 2d 116, 129 (D. Mass. 2013); *see also Lawrence v. Hutchinson*, 204 P.3d 532, 540 (Idaho Ct. App. 2009) (where parties reached agreement on monetary amount of settlement but not indemnity language, court found that there remained material term left to be negotiated and thus no enforceable agreement); *Paul R. Ponfil Tr. v. Charmoli Holdings, LLC*, 2019 WI App 56, ¶¶ 20-26 (where parties' actions made materiality of an indemnity provision evident and

negotiations on the provision were ongoing, court could not find an integrated enforceable settlement agreement); *Collins v. Mike's Trucking Co.*, 2005-0238, p.10 (La. App. 1 Cir. 5/5/06) (where a dispute regarding an indemnity provision remained, no enforceable settlement agreement formed).

¶ 35    In his briefing, Elkerton conceded that State Farm sent the second October 14 email "to ensure that State Farm and [Elkerton] would be protected from any Conduent lien." But, as the district court recognized, the proposed release already addressed this precise subject. Evidently not content with the language of the release contained in its first October 14 email, State Farm demanded *a separate and additional* agreement as a condition to the tender of the $100,000 policy limits. Its own actions prevent State Farm from plausibly contending that its demand for a separate indemnity agreement was not a material term.

¶ 36    Importantly, we don't know what words would have satisfied State Farm (or would have been acceptable to the Stansberrys in the indemnity provision) precisely because the parties never negotiated that term. The parties could have been deadlocked on the language of the indemnity agreement. This is precisely the

17

situation the Idaho appellate court addressed in *Lawrence v. Hutchinson*, where the court held there was no contract because the indemnity agreement language had not been negotiated or agreed upon. 204 P.3d at 540.

¶ 37    That ends or should have ended both the district court's and the majority's inquiries, leading inexorably to the conclusion that there was no enforceable settlement agreement. Under the law of contracts, it makes no difference whether the Stansberrys' lawyer intended on October 16 to accept the offer contained in the first October 14 email. That offer was no longer capable of acceptance.

¶ 38    Despite all of this, in a finding central to its judgment, the district court stated "that a meeting of the minds occurred when Thompson [the Stansberrys' lawyer] sent the October 16 email." However, because that offer — the offer to pay the Stansberrys $100,000 — had been terminated by operation of law when State Farm communicated its second October 14 email, this finding cannot stand, whether we review for clear error or de novo.

¶ 39    Treating State Farm's second October 14 email as a superseding offer, the undisputed writings demonstrate that the Stansberrys rejected it. By responding that the original release

covered the subrogation interest and that the Stansberrys would "take care of" it, this message unambiguously rejected State Farm's email offering *either* the full proceeds (if Stansberry agreed to the indemnity/hold harmless provision) *or* an amount of the proceeds after deducting the subrogation interest amount. Instead, Thompson did not accept any offer or counteroffer contained in the second October 14 email. At most, Thompson's request to revert to the original offer contained in the first October 14 email was a counteroffer, which State Farm never accepted. (It is undisputed that State Farm never tendered the settlement funds, either conditionally or otherwise.) *Cf. Haselden-Langley Constructors, Inc. v. D.E. Farr & Assocs., Inc.*, 676 P.2d 709, 711 (Colo. App. 1983) (an attempt to accept an offer on materially different terms than the original offer is a counteroffer, not an acceptance). Therefore, no settlement contract resulted based on State Farm's superseding offer.

¶ 40  The district court appears to have recognized at least one of the problems created by the second October 14 email. As I understand its order, it found or concluded that State Farm's alternative demand in the second October 14 email for a separate

19

indemnity agreement was a "red herring" because State Farm's original tendered release accomplished the same thing as a separate indemnity agreement.

¶ 41 There are two reasons why the district court's "red herring" analysis does not withstand scrutiny. First, it does not address the undisputed fact that the second October 14 email presented the Stansberrys with *two* disparate options, at least one of which was plainly inconsistent with the simple, unconditional offer contained in the first October 14 email.

¶ 42 Second, the red herring argument fails on its own terms as indicated in the cases cited above regarding the materiality of a demand for an indemnity agreement. *See D'Agostino*, 969 F. Supp. 2d at 129; *Lawrence*, 204 P.3d at 540; *Paul R. Ponfil Tr.*, ¶¶ 20-26; *Collins*, 2005-0238, p.10.

¶ 43 What is a real red herring in the context of this case is the appellate standard of review, because regardless of whether this court reviews de novo or for clear error, the result is the same: the offer contained in State Farm's first October 14 email terminated by operation of law when State Farm communicated its second

October 14 email.  As a result, there was, as a matter of law, no offer capable of acceptance by the Stansberrys.  Thus, no contract.

¶ 44    The standard of review question, upon which the majority essentially decides this case, presents several interesting questions.[2]  The first is what standard of review — de novo or clear error — applies when a trial court holds an evidentiary hearing but then rejects on credibility grounds the testimony presented at the hearing and decides the case on the basis of undisputed writings.  Does that factual scenario bring into play the holding of *Sumerel v. Goodyear Tire & Rubber Co.*, 232 P.3d 128, 132 (Colo. App. 2009), which held, "In contract cases, when the facts are undisputed and the pertinent documents are before us, we are not bound by the district court's findings and conclusions and may resolve the issues as a matter of law"?

---

[2] Sometimes it is difficult to draw the line between findings of historical facts (to which appellate courts must defer if there is virtually any record support), ultimate findings of fact, and questions of law.  *Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2019 CO 51, ¶¶ 4, 18.  An appellate court does not defer to a lower court's determination of a question of law.  *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000).  The characterization of whether a lower court's action is a finding of fact or a conclusion of law (or a mixed question of law and fact) is important, and sometimes outcome determinative.

¶ 45    Or does the mere fact that an evidentiary hearing was held mean that, in all such cases, the standard of review is clear error irrespective of whether the dispositive evidence is written and unambiguous? These questions raise a subsidiary question: Did the district court reject all of the testimonial evidence presented at the hearing, as I think it did, or did it reject only some of it, as the majority thinks?

¶ 46    While interesting, none of these questions need to be resolved to decide this case. This is not a case in which any of the relevant offers, counteroffers, or acceptances were oral or ambiguous. In those circumstances, the trial court must determine what was said by the parties and then apply the applicable law to those findings. Those findings of fact are entitled to deference by an appellate court. *See Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2019 CO 51, ¶ 18. But here, *all* of the relevant offers, counteroffers and alleged acceptances were in writing and there is nothing ambiguous about any of them. Those written offers, counteroffers, and acceptances have legal consequences under the law of contracts and, in my view, the district court had no authority to ignore or rewrite those writings. Instead, in a contract case such as

this, the proper function of the district court is to determine whether, under the law of contracts, those undisputed writings created an enforceable contract.[3]

¶ 47     While a fact finder has broad authority to find the disputed facts, a fact finder cannot properly ignore a relevant (here, dispositive) unambiguous writing in the guise of finding or recreating the historical facts. Doing so constitutes clear error, so even if the clear error standard of review applies, I would find clear error occurred here. *See Sentinel Colo. v. Rodriguez*, 2023 COA 118, ¶ 18 ("A court's finding of fact is clearly erroneous if there is no

---

[3] Another portion of the district court's analysis demonstrates that the court departed from the proper task before it. The court stated that after the Stansberrys' lawyer's October 16 email "State Farm never expressed to Thompson that it was insisting the Stansberrys still execute a 'hold harmless' agreement," and "[i]f Thompson had forwarded a copy of a signed release . . . it is more likely than not that State Farm would have issued a check for $100,000 per Thompson's payment instructions." This analysis asks and answers the wrong question. The question is not whether, irrespective of whether there was a legally enforceable contract, it was more likely than not that a settlement would have been consummated if either party took other steps, including the one suggested by the court. The only proper questions before both the district court and this court are whether under the law of contracts there existed an offer legally capable of acceptance and whether the counterparty accepted that offer without any material change. *Haselden-Langley Constructors, Inc. v. D.E. Farr & Assocs., Inc.*, 676 P.2d 709, 711 (Colo. App. 1983).

support for it in the record.") (citation omitted) (*cert. granted* July 22, 2024).

¶ 48     For these reasons, I would hold that no enforceable settlement agreement came into existence.  Therefore, the district court's order enforcing the putative settlement agreement and its resulting judgment of dismissal with prejudice should be reversed and the case remanded with directions to reinstate the Stansberrys' claims. I respectfully dissent from the majority's contrary rulings.